**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | | |
|---|---|---|
| **WEEKS MARINE, INC., *et al.*,** | ) | |
| **Plaintiffs/Counter-Defendants,** | ) | |
| | ) | **CIVIL ACTION 14-00231-KD-B** |
| **v.** | ) | |
| | ) | |
| **BRANDON WRIGHT,** | ) | |
| **Defendant/Counter-Plaintiff.** | ) | |

**ORDER**

This matter came before the Court for a non-jury trial on June 30, 2015. Upon consideration of the parties' arguments and documentary and testimonial evidence[1] presented at trial, the Court makes the following findings of fact and conclusions of law.

**I.    Findings of Fact**

This litigation stems from a May 23, 2014 declaratory judgment action filed by Atlantic Sounding Co., Inc. (ASI) and Weeks Marine, Inc. (Weeks) against Brandon Wright (Wright) for a maintenance and cure determination. (Docs. 1, 4). In response, Wright asserted counterclaims against ASI/Weeks for maintenance and cure, negligence, and unseaworthiness. (Doc. 7).

On May 9, 2014, Wright was electrocuted while employed by ASI as a deckhand on the vessel M/V VIRGINIA, a tugboat owned by Weeks and situated off the North Carolina coast. The cause of the electrocution is not in dispute: the electrocution occurred when Wright, working on the tugboat, handled a frayed and unsafe extension cord while the crew tried to jump start a crane on an adjacent dredge barge. Likewise, that Wright has received past maintenance and cure for his injury from ASI/Weeks (through October 27, 2014) is not in dispute. What is in

---

1 Including deposition excerpts submitted via bench book and video depositions submitted via CD/DVD, as those were admitted into evidence at trial.

dispute is who is at fault, whether Wright is entitled to *future* maintenance and cure or has obtained maximum medical improvement (MMI), and the extent of his damages.

Wright was 22 years old when he was hired as a deckhand with ASI in 2014. Previously, he had worked at a fast food restaurant, grocery store, as a barber, as a longshoreman (loading/unloading cargo), and as a deckhand hydroblasting oil of barges and tanks.   In February 2014, he completed one (1) day of training at ASI/Weeks headquarters.   This training included safety training, but the specifics are not known to the undersigned.[2]   Thereafter he was assigned and completed two (2) tours of duty, *a.k.a.* as "hitches" on other vessels.

On May 8, 2014, Wright was flown to North Carolina to join the M/V VIRGINIA crew for a "hitch" (28 days).   Wright arrived around 3:00 p.m., was shown around by deck engineer Robert Dunaja (Dunaja), took a short nap, ate dinner, and the commenced work at 6:00 p.m.

Around 4:00 a.m. on May 9, 2014, Captain Renald Ayote (Capatain Ayote) directed Wright to retrieve the battery charger box and an extension cord to assist an adjacent dredge barge jump a crane battery.   Wright complied with the directive, retrieved the charger box from the engine room, and passed it over to the barge.   Wright then went to the fiddley[3] to retrieve an extension cord.   There were two (2) extension cords: one extension cord was draped across a power washer and another extension cord was hanging on the wall.   Wright, hurrying to comply with Captain Ayote's instructions, quickly grabbed the first extension cord he saw -- the cord draped over the power washer.   At this point Captain Ayote entered the fiddley to check on Wright and saw that he had retrieved an extension cord.   Captain Ayote took the cord from

---

2 The Court finds that there is insufficient proof that the safety video presented at trial (ASI/Weeks Trial Ex. 4) was the video viewed by Wright.   Specifically, the Defendants failed to present any evidence that the video viewed by Wright as indicated on the log (ASI/Weeks Trial Ex. 1G), was the same video presented at trial.

3 The fiddley is a covered deck area around the stairs that descend to the engine room.   It is adjacent to the galley and is used to store equipment and inclement weather gear.

Wright, plugged in the cord, passed it through the porthole to Wright, and returned to the wheelhouse.[4]  While Wright was outside the porthole holding the extension cord, he was electrocuted.  Wright, who was wearing a hardhat, fell to the ground, hit his head, and continued to hold the cord until it was snatched from his grasp approximately 10-30 seconds later.  Wright was immediately discovered, and while observed to be conscious, was clearly in pain.  Wright was administered first aid and transported to the nearest hospital, Carteret General Hospital in Morehead City, North Carolina.  Wright remained hospitalized until May 13, 2014.

On May 23, 2014, while Wright was still undergoing medical treatment, ASI/Weeks initiated this lawsuit against him, claiming he was failing to cooperate and provide medical information, thwarting their ability to assess maintenance and cure.   Wright testified that neither Weeks nor ASI contacted him between May 13-May 23, 2014.  From May 2014 through at least November 7, 2014, Wright underwent medical treatment for injuries and pain related to the electrocution.  Additionally, at the June 2015 trial, Wright testified that he was scheduled to see an orthopedist in July 2015.

## II.   Conclusions of Law

### A.   Unseaworthiness & Negligence

Although causation is not at issue, liability is disputed.  In response to Weeks and ASI's action to obtain declaratory judgment, Wright asserts, in part, counterclaims for unseaworthiness against Weeks and Jones Act negligence against ASI.   The standard of liability for an unseaworthiness claim is distinct from than that of a Jones Act negligence claim.  Usner v.

---

[4] Although Captain Ayote initially testified that only Wright handled the cord, when confronted with Wright's testimony that Captain Ayote plugged in the cord and passed it through the porthole to Wright, Captain Ayote indicated that he did not recall whether that was the sequence of events.  The Court finds Wright's testimony to be credible on this issue.  This is supported by Captain Ayote's statement that Wright was tending the cord to keep it from getting into water.   It is unlikely that Wright could have passed the cord through the porthole and kept it off the wet outside deck without assistance.

Luckenbach Overseas Corp., 400 U.S. 494, 499 (1971).   In fact, there is a "complete divorcement of unseaworthiness liability from concepts of negligence."  Id.

1.    **Unseaworthiness**

Wright asserts an unseaworthiness counterclaim against vessel owner Weeks. To succeed, Wright must prove each of the following by a preponderance of the evidence: 1) that the vessel or appliances appurtenant to the vessel were unseaworthy; and 2) that the unseaworthy condition was the proximate cause of injury to the plaintiff.  Stewart v. Dutra Constr. Co., 543 U.S. 481, 487 (2005) (citing The Osceola, 189 U.S. 158 (1903); Crow v. Cooper Marine & Timberlands Corp., 657 F.Supp.2d 1248, 1251 (S.D. Ala. 2009) (detailing the elements of unseaworthiness claims).

The warranty of seaworthiness provides that a vessel owner has an absolute, nondelegable duty to provide a seaworthy vessel.  Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960); Deakle v. John E. Graham & Sons, Corp., 756 F.2d 821, 825 (11th Cir. 1985).  This duty also encompasses the owner's obligation to ensure that appliances appurtenant to the vessel are seaworthy.  Mitchell, 362 U.S. at 550.  For example, a vessel's unseaworthy condition might arise from circumstances such as defective gear or appurtenances in disrepair.  Usner, 400 U.S. at 517; Churchwell v. Bluegrass Marine, Inc., 444 F.3d 898, 906 (6th Cir. 2006) (illustrating examples of unseaworthiness, such as missing necessary gear, supplying crew with damaged equipment, or instructing a crew member to use unsafe work methods).  The test is not whether the vessel is in perfect condition and free from all risks of injury, but whether the vessel is reasonably fit for its intended purpose or use.  Mitchell, 362 U.S. at 550.

Moreover, "[t]he shipowner [becomes] liable for failure to supply a safe ship irrespective of fault and irrespective of the intervening negligence of crew members. *Mahnich v. Southern*

*S.S. Co.*, 321 U.S. 96, 100, 64 S.Ct. 455, 458, 88 L.Ed. 561 (1944) ('[T]he exercise of due diligence does not relieve the owner of his obligation to the seaman to furnish adequate appliances.... If the owner is liable for furnishing an unseaworthy appliance, even when he is not negligent, a fortiori his obligation is unaffected by the fact that the negligence of the officers of the vessel contributed to the unseaworthiness'). The Court reaffirmed the rule two years later in Se*as Shipping Co. v. Sieracki*, 328 U.S. 85, 94–95, 66 S.Ct. 872, 877–878, 90 L.Ed. 1099 (1946) ("[Unseaworthiness] is essentially a species of liability without fault")." Miles v. Apex Marine Corp., 498 U.S. 19, 25-26, 111 S.Ct. 317, 322 (1990).

Upon inspection of the cord, all of the crew of agreed that the extension cord used was visibly unsafe and should not have been on the vessel for use.  Moreover, Edward Brill (Brill), a forensic project electrical engineer and an expert in marine electrical accidents, testified that the extension cord was unseaworthy due to multiple locations of insulation damage visible on the cord and a missing ground prong on the male plug end.  Brill also noted that the outlet used to plug the extension cord was not properly grounded and had no ground fault protection at the time of the accident.  Brill concluded that if the cord and the outlet been properly grounded, the shock would have been less in terms of both intensity and duration.  Based on this evidence the Court finds that the tugboat was unseaworthy because the equipment on board, *i.e.* the cord and outlet, were not suited for the use for which they were intended.

With respect to causation, proximate cause is the applicable standard on an unseaworthiness claim.  Stewart, 543 U.S. at 487.  The Plaintiff is required to show that the vessel's "unseaworthiness played a *substantial part* in bringing about or actually causing the injury and that [ ] the injury was either a direct result or a reasonably probable consequence of the unseaworthiness." Smith v. Trans-World Drilling Co., 772 F.2d 157, 162 (5th Cir. 1985)

(emphasis added).   In that regard, the Eleventh Circuit explains as follows: "In <u>Spinks</u> we adopted a '*substantial factor*' standard of causation for 'unseaworthiness' claims brought under general maritime law." <u>McClow v. Warrior & Gulf Navigation Co.</u>, 842 F.2d 1250, 1251 (11th Cir. 1988) (emphasis added).   As previously stated there is no dispute that the accident was caused by the unsafe extension cord.   Therefore, the vessel owner, Weeks, is liable for the injuries sustained by Wright as a result of the unseaworthy condition of M/V VIRGINIA.

### 2.     **Jones Act Negligence**

Wright asserts a Jones Act negligence counterclaim against ASI.  The Jones Act allows a seaman to sue his employer "for injury ... resulting in whole or in part from the negligence" of the employer.  46 U.S.C. § 30104, *et seq*. (incorporating the remedies under FELA); 45 U.S.C. § 51 (FELA); <u>Atlantic Sounding Co., Inc. v. Townsend</u>, 557 U.S. 404, 415 (2009).

To recover under the Jones Act for negligence, Wright must prove as a threshold matter that the injury occurred during the course of employment as a seaman upon a vessel.  <u>Chandris, Inc. v. Latsis</u>, 515 U.S. 347, 348 (1995).  In this case, there is no dispute that Wright was injured while employed as a seaman on a vessel.   The record reveals ASI employed Wright as a deckhand upon the M/V VIRGINIA.   Wright was electrocuted and injured while holding an extension cord on the M/V VIRGINIA.   Wright's injuries occurred while performing duties at the direction of the tugboat's captain.   Based upon this evidence, the Court finds that the M/V VIRGINIA is a vessel and that Wright is a seaman who sustained injuries during the course of his employment.

Additionally, Wright must prove each of the following by a preponderance of the evidence: 1) that ASI was "negligent" as claimed; and 2) that such negligence was "a cause" of the plaintiff's injury.  46 U.S.C. § 30104; <u>Stewart</u>, 543 U.S. at 487; <u>Cain v. Transocean Offshore</u>

USA, Inc., 518 F.3d 295, 298 (5th Cir. 2008) (detailing the elements of Jones Act negligence claims).  An employer's duty of care to a seaman is a heightened duty.  Dempsey v. Mac Towing Inc., 876 F.2d 1538, 1542 (11th Cir. 1989).  This duty is breached when an employer fails to "provide a safe workplace by neglecting to cure or eliminate obvious dangers of which the employer or its agents knew or should have known and that such failure caused the plaintiff's injuries and damages."  Taylor v. TECO Barge Line, Inc., 517 F.3d 372, 383 (6th Cir. 2008); see also Dempsey, 876 F.2d at 1542-1543; Hernandez v. Trawler Miss Vertie Mae, Inc., 187 F.3d 432, 437 (4th Cir. 1999) (providing that the breach of the duty to protect against foreseeable harm is grounds for recovery under the Jones Act).

The Court finds that ASI failed to provide a safe workplace by neglecting to remove the extension cord.  The visibly unsafe extension cord was located in an open and obvious place in the fiddley.  Crew members pass through the fiddley to get to the galley and the engine room. The fiddley is a commonly used room by the crew.  Moreover, considering that the vessel and its equipment are allegedly inspected for safety by each crewmember, the extension cord should never have been available on the vessel for use.  Thus, in regards to negligence, the Court finds that this defect was an obvious danger that ASI should have known existed.  Further, the Court also finds that the extension cord was the cause of Wright's injuries.

**B.**   **Maintenance & Cure**

Weeks/ASI initiated this action to obtain a declaratory judgment as to its maintenance and cure obligations only a few weeks after Wright's electrocution, asserting that he was not cooperating and they had no ability to assess his status to began providing maintenance and cure. That particular issue appears to have become moot when Weeks/ASI began paying Wright maintenance and cure and commenced the discovery process in this Court.  As such, the only

remaining issue or controversy for the declaratory judgment claim is whether Wright is entitled to *future* maintenance and cure or has reached maximum medical improvement (MMI) such that Weeks/ASI's obligations have been fulfilled.[5]   Wright asserts he has not reached MMI, reporting ongoing problems and continued treatment.[6]   Weeks/ASI contend that he has reached MMI.

As set forth in <u>Smith v. BP America, Inc.</u>, 522 Fed. Appx. 859, 863 (11th Cir. 2013) (citations omitted): "[a] seaman's right to maintenance and cure is implicit in the contractual relationship between the seaman and his employer, and is designed to ensure the recovery of these individuals upon injury or sickness sustained in the service of the ship."   "Maintenance and cure"[7] is thus a seaman's remedy (*i.e.*, compensation) if he is injured while employed on a ship and he recovers such benefits, from his employer and/or the vessel owner, until the time of maximum cure (*i.e.*, MMI).   <u>See</u>, e.g., <u>Cabrera Espinal v. Royal Caribbean Cruises, Ltd.</u>, 253 F.3d 629, 630-631 (11th Cir. 2001); <u>Crow v. Cooper Marine & Timberlands Corp.</u>, 657 F.Supp.2d 1248, 1251-1252 (S.D. Ala. 2009); <u>Hall v. Noble Drilling (U.S.), Inc.</u>, 242 F.3d 582, 586 (5th Cir. 2001).   "A vessel owner's duty to provide maintenance and cure embraces not only the obligation to provide a subsistence allowance and to pay for medical expenses actually

---

5  Wright's additional contentions, that he did not receive timely maintenance and cure payments from Weeks/ASI for a number of weeks and that he was not also paid in full, appear moot as explained at trial (Wright testified that while some payments may have been untimely, he was eventually paid in full).

6 Which Wright testified is related to his testicular pain that is painful throughout the day.

7 As explained in <u>Zukowski v. Foss Maritime Co.</u>, 2013 WL 1966001, *6 (S.D. Ala. May 10, 2013):

"Maintenance" is "a living allowance" paid on a per diem basis, while "cure" is intended to "cover[] nursing and medical expenses." *Cabrera Espinal*, 253 F.3d at 631 (citation omitted); *see also Kasprik v. United States*, 87 F.3d 462, 464 (11th Cir.1996) ("It is a well recognized rule in admiralty that when a seaman is injured or becomes ill while employed aboard a vessel, he is entitled to daily subsistence and medical treatment until his maximum cure has been reached."). The obligation to pay maintenance and cure continues until such time as the seaman has reached the point of maximum cure. *See Nichols v. Barwick*, 792 F.2d 1520, 1523 (11th Cir.1986); *Gooden v. Sinclair Refining Co.,* 378 F.2d 576, 579 (3rd Cir.1967) ("The obligation to provide maintenance and cure continues until maximum medical recovery has in fact been achieved.").

Thus, "maintenance" is the right to food/lodging, while "cure" is the right to necessary/appropriate medical services.

incurred by the seaman, but to take all reasonable steps to insure that the seaman, when he is injured or becomes ill, receives proper care and treatment." Crow, 657 F.Supp.2d at 1252. "[M]aximum cure is achieved when it appears probable that further treatment will result in no betterment of the seaman's condition…where it appears that the seaman's condition is incurable, or that future treatment will merely relieve pain and suffering but not otherwise improve the seaman's physical condition, it is proper to declare that the point of maximum cure has been achieved." Pelotto v. L&N Towing Co., 604 F.2d 396, 400 (5th Cir. 1979) (citations omitted).[8]

The seaman's own negligence, if any, will not bar recovery, Vaughan v. Atkinson, 369 U.S. 527 (1962), and thus a shipowner's duty to pay maintenance and cure is "virtually automatic," Baucom v. Sisco Stevedoring, LLC, 506 F.Supp.2d 1064, 1073 (S.D. Ala. 2007).[9] As such, to recover for maintenance and cure, Wright need only prove that: 1) he was employed as seaman, 2) the injury/illness occurred, manifested, or were aggravated while in the ship's service, 3) the wages to which he is entitled, 4) expenditures for medicines, medical treatment, board, and lodging; and 5) the injury/illness occurred without willful misbehavior[10] by the seaman. Johnson v. Cenac Towing Inc., 468 F.Supp.2d 815, 832 (E.D. La. 2006), *vacated on other grounds*, 544 F.3d 296 (5th Cir. 2008)). See also Crow, 657 F.Supp.2d at 1252; Crow v.

---

8 Decisions of the former Fifth Circuit rendered prior to October 1, 1981, are binding precedent on the Eleventh Circuit. Bonner v. City of Prichard, Ala., 661 F.2d 1206, 1209 (11th Cir. 1981).

9 As explained in Bloom v. Weeks Marine, Inc., 225 F.Supp.2d 1334, 1335-1336 (M.D. Fla. 2002):

This obligation has been characterized as an "almost paternalistic duty of the shipowner toward the crew." *Garay v. Carnival Cruise Line, Inc.,* 904 F.2d 1527, 1530 (11th Cir.1990). When determining whether an individual is entitled to maintenance and cure, fault is generally not considered. *See Norris, supra,* at § 26:1. Therefore, the doctrines of "contributory negligence, assumption of risk, [and] the fellow-servant rule of the common law" are not applicable, *id.,* and "[e]ven if the seaman is injured through his own negligence, he does not forfeit his right to maintenance and cure." *Garay,* 904 F.2d at 1529.

10 Per Sanders v. U.S., 2006 WL 2583571, *3 (S.D. Ala. Sept. 6, 2006): "[i]n the maritime law it has long been held that while fault of the seaman will forfeit the right to maintenance and cure, it must be 'some positively vicious conduct-such as gross negligence or willful disobedience of orders.' ' *Warren v. U.S.,* 340 U.S. 523, 528 (1951) (citations omitted). "Only some wilful misbehavior or deliberate act of indiscretion suffices to deprive the seaman of his protection." *Aguilar v. Standard Oil Co.,* 318 U.S. 724, 731 (1943)…."

Cooper Marine & Timberlands Corp., 2009 WL 103500, *3-4 (S.D. Ala. Jan. 15, 2009).  The

seaman's burden is "relatively light."  Freeman v. Thunder Bay Transp. Co., 735 F. Supp. 680,

681 (M.D. La. 1990).  See also Baucom, 506 F.Supp.2d at 1072-1073 (citations omitted)

("[s]uch a light burden is consistent with the notion that this doctrine was crafted so that a

seaman's right to maintenance and cure 'is so inclusive as to be relatively simple, and can be

understood and administered without technical conditions[]'").

Thereafter, the burden shifts to ASI/Weeks, "to prove that the seaman has reached the

point of maximum medical improvement." Costa Crociere, S.p.A. v. Rose, 939 F. Supp. 1538,

1548 (S.D. Fla. 1996). Maintenance and cure "is not an open-ended duty[]" or "mandatory

lifetime health insurance policy for injured seamen[]" Baucom, 506 F.Supp.2d at 1074 and 1076,

and "does not hold a ship to permanent liability for a pension, neither does it give a lump-sum

payment to offset disability based on some conception of expectancy of life[,]" Farrell v. United

States, 336 U.S. 511, 519 (1949).  Instead, the duty extends during the period when the seaman is

incapacitated and continues until he reaches MMI.  Vaughan, 369 U.S. at 531.

Nevertheless, "[t]he 'decision to terminate must be unequivocal.'…All available medical

evaluations should be considered in deciding whether to terminate maintenance and cure

payments[.]" Lee v. Metson Marine Servs., Inc., 2012 WL 5381803, *3 (D. Hawai'i Oct. 31,

2012).  See also Tullos v. Resource Drilling, Inc., 750 F.2d 380, 388 (5th Cir. 1985).  Any

ambiguities regarding maintenance "are to be resolved [by the Court[ in favor of the seaman[,]"

"who are its wards." Vaughan, 369 U.S. at 531-532.  The Vaughan rule is applied when there is

conflicting credible medical testimony regarding MMI.  See, e.g., Johnson v. Marlin Drilling

Co., 893 F.2d 77, 80 (5th Cir. 1990) ("[w]hile it is obviously within a district court's domain to

judge the credibility of the evidence presented to it, in cases of maintenance and cure, important

considerations must be taken into account…it is crucial to ensure that the rule stated in *Vaughan*, regarding the existence of ambiguities and doubts, is applied correctly....[U]nder the *Vaughan* rule, the possibility of physical improvement, expressed by [the seaman's second doctor], would require a finding in favor of [the seaman][]").[11]  "The broad purposes which maintenance and cure payments serve should not be defeated 'by restrictive and artificial distinctions....If leeway is to be given in either direction, all the considerations which brought the liability into being dictate it should be in the sailor's behalf.'" Guidry v. The Offshore Drilling Co., 2007 WL 519761, *3 (W.D. La. Feb. 15, 2007) (citing Johnson, 893 F.2d at 79 (quoting Aguilar v. Standard Oil Co., 318 U.S. 724, 735 (1943)).

Further, "reasonable attorney's fees and punitive damages may be legally awarded…upon a showing of a ship owner's willful and arbitrary refusal to pay maintenance and cure." Atlantic Sounding Co. v. Townsend, 496 F.3d 1282, 1284 (11th Cir. 2007) (internal quotes omitted), *aff'd*, 557 U.S. 404 (2009).  See also Crow, 657 F.Supp.2d at 1252-1253; Baucom v. Sisco Stevedoring, LLC, 560 F.Supp.2d 1181, 1200 (S.D. Ala. 2008).  While there is no "bright line" to measure willful or arbitrary conduct, examples include: 1) laxness in investigating a claim; 2) termination of benefits in response to the seaman's retention of counsel or refusal of a settlement offer; and 3) failure to reinstate benefits after diagnosis of an ailment previously not determined medically.  Hines v. J.A. LaPorte, Inc., 820 F.2d 1187, 1190 (11th Cir. 1987); Crow, 657

---

11 Gorum v. Ensco Offshore Co., 2002 WL 31528460, *6-7 (E.D. La. Nov. 14, 2002) (discussing cases applying Vaughan: "*See also In re Sirret Offshore Towing Company,* 1997 U.S. Dist. LEXIS 13408, *15, *16-17 (E.D.La.1997) ("[T]here is conflicting testimony between two board certified orthopedic surgeons as to exactly when [plaintiff] reached maximum medical cure....[A]ny doubt...must be resolved in favor of [plaintiff]."); *Williams v. American River Trans. Co.,* 1996 U.S. Dist. LEXIS 14140, *10-11 (E.D.La.1996) (holding that continuing maintenance and cure is owed when doctors dispute MMI, starting from the date the shipowner discontinued maintenance and cure based on a finding by one doctor of MMI)[]").  See also generally Wolf v. McCulley Marine Servs., Inc., 2012 WL 4077240 (M.D. Fla. Sept. 17, 2012) (dealing with a conflicting medical evidence scenario); Halcomb v. Kimberly Clark Tissue Co., 2000 WL 1802071 (S.D. Ala. May 31, 2000) (finding ambiguities existed as to whether a seaman reached MMI, despite a medical finding of MMI, because the finding was based on a mere "projection" and there was no showing he was "unequivocally diagnosed as reaching MMI[]").

F.Supp.2d at 1252.  The seaman "must establish that defendants' conduct…was callous, willful, unreasonable, wanton, egregious or otherwise in bad faith."  Baucom, 560 F. Supp.2d at 1200.

At the outset, there is no dispute about any aspect of the maintenance and cure claim apart from whether Wright has reached MMI (*i.e.*, which dictates his entitlement to *future* maintenance and cure).  The evidence at trial reveals that Wright has reached MMI even though he reports continued and ongoing pain and some difficulties in daily life (*e.g.*, standing for extended periods).  Upon consideration, the Court finds that Wright is not entitled to *future* maintenance and cure (and/or attorneys' fees or punitive damages).

The electrocution occurred on May 9, 2014.  Wright was hospitalized for 5 days, until his May 13, 2014 discharge.  Wright's hospital discharge summary indicates that the electrocution caused muscle pain weakness and numbness in his hands and feet.  (Wright Trial Ex. 19-A, 19-B).  He also had a small abrasion on his scalp.  It was noted that there was no evidence of internal organ or end-organ damage.  On May 13, 2014, upon discharge Wright was able to ambulate with the use of a walker.  He was prescribed pain medication and it was recommended that he receive outpatient physical therapy.  The prognosis for complete recovery was excellent.

There is no evidence that Wright ever followed through with physical therapy.  However, Wright did consult with Dr. Thead, a family practitioner, on May 16, 2014.  At this visit Wright complained of muscle discomfort and leg pain.  Dr. Thead prescribed him pain medication and referred him to a neurologist for follow-up. (Wright Trial Ex. D (Dep. Dr. Thread at 6)).  Consistent with Dr. Thead's testimony that Wright was not the most compliant patient, Wright did not consult a neurologist as directed. Rather, according to the medical records, Wright returned to Dr. Thead on August 26, 2014.  (Wright Trial Ex. 17-B).  At this visit, Wright complained of feet pain, headaches and testicular discomfort.  Because Wright's CPK was

elevated, he was hospitalized on August 27, 2014 for further testing. (Wright Trial Ex. 20-A).

At the hospital, Wright was examined by Dr. Hecker. (Wright Trial Ex. 20-B). Dr. Hecker opined that "the elevated CPK can be a normal finding in muscular men. There is no evidence of weakness to suggest myopathy at this time." At this exam, Wright denied weakness in his legs, but was told if weakness develops a nerve conduction (EMG) should be pursued.

On September 26, 2014, Wright was examined by Thomas C. McGee, M.D. (Dr. McGee) for "tingling in legs" per Dr. Thead's referral -- "to alleviate burning and tingling in his legs and his feet and myalgia after he had an electrocution[.]" (Wright's Trial Ex. 17-A). Dr. McGee noted that Wright had been evaluated for the numbness and tingling and weakness in his legs but "still an answer is not clear" and so was sent to him to see if there was evidence of a primary autoimmune type disorder. Wright reported burning/tingling, "some difficulty going up stairs because of some weakness in his legs," testicular pain, and an elevated CPK. Dr. McGee found no evidence of inflammatory/autoimmune disorder but agreed with a workup by neurology.

The next indication of record that Wright consulted a doctor was his consultation with Dr. Chalhub, a neurologist. (Wright Trial Ex. 17-C). Although Dr. Thead indicates that he refers patients to Dr. Chalhub, it is unclear whether Wright went to Dr. Chalhub because of Dr. Thead's referral or because the defendants requested the exam. In any event, on October 27, 2014, Dr. Chalhub performed a physical and neurological examination on Wright and then obtained nerve conduction velocities.[12] Dr. Chalhub testified that Wright's examination and the nerve studies were normal. Dr. Chalhub concluded that Wright had reached MMI, that he didn't appear to have any significant long-term injury and that he did not have any limitation or restrictions based on his injuries from the electrocution. Dr. Thead concurred with Dr.

---

12 According to Dr. Chalhub, a nerve conduction velocity test is an electrical study measuring the function and conduction of the peripheral nerves in the arms and legs.

Chalhub's opinion.

Thus, it is only Wright's subjective opinion that he has not reached MMI. This opinion is not supported by any medical evidence. Accordingly, the Court finds that Wright reached MMI by at least October 27, 2014. The evidence indicates, and Wright agreed, that he was paid maintenance and cure through October 27, 2014.

Finally, to the extent Plaintiff seeks attorneys' fees and punitive damages related to maintenance and cure, the Defendants honored their obligations. Wright has not established examples of willfulness or bad faith on the part of the Defendants (*e.g.*, no laxness in investigating a claim, no termination of benefits in response to the seaman's retention of counsel or refusal of a settlement offer, no failure to reinstate benefits after diagnosis of an ailment previously not determined medically). See also Crow, 657 F.Supp.2d at 1262. Accordingly, Wright claim for maintenance and cure attorneys' fees or punitive damages is **DENIED.**

## C.    Damages

Wright seeks damages for **$363,225.00** for future lost wages,[13] **$16,738.09** for past medical expenses, **an unspecified sum** for future medical expenses, and **$200,000** for pain and suffering. In support, Wright testified that he can perform only minimum wage jobs, but not return to work as a deckhand. Additionally, Wright presented expert testimony of forensic economist George Henry Carter, III, Ph.D (Dr. Carter).

---

[13] At trial, Dr. Carter referenced the sum of $16,333.00 for Wright's past lost wages. Lost earnings are usually measured by the actual wage losses incurred by the plaintiff from the date of the accident to the date of trial. Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW §§ 5–15.1 (4th ed. 2004). Here, however, as Wright was fully paid after the May 9, 2014 accident through the end of his "hitch," his past lost wages would presumably be tallied from the date after his hitch through the date of MMI. Regardless, the undersigned was provided no specific dates or evidence at trial on this claim and so is not in a position to assess and/or award past lost wages, in any amount. Moreover, while Dr. Carter testified that the $16,333 sum was calculated as past wage loss from the May 9, 2014 accident through Dr. Chalhub's December 30, 2014 deposition, the Court does not understand use of these arbitrary dates, dates which do not even exclude the time Wright was paid for his "hitch." Thus, to the extent Wright maintains a past lost wages claim, it is **DENIED.**

In contrast, Weeks/ASI contend that Wright is fully capable of returning to work having reached MMI, he is not entitled to past/future wages, and he is not entitled to future medical expenses.  Weeks/ASI assert further, that Wright is 100% at fault such that he is also not entitled to any damages for pain and suffering.

Under the Jones Act and general maritime law, an injured seaman is entitled to monetary recovery for past, present, and future loss of earning capacity and wages, medical expenses, and pain and suffering resulting from an injury caused by negligence and/or unseaworthiness. Nichols v. Weeks Marine, Inc., 513 F.Supp.2d 627, 637 (E.D. La. 2007).  "In assessing damages, the fact-finder should ascertain the past and future impact of the injury by examining (1) the nature, extent, and duration of the injury; (2) the plaintiff's pain, discomfort, suffering, and anxiety; and (3) any lost earnings….Damages must be supported by the facts established in the record and cannot be speculative."  In re Moran Towing Corp., 984 F.Supp.2d 150, 182 (S.D.N.Y. 2013) (internal citations omitted).  Having found Weeks liable on the unseaworthiness claim and ASI liable on the negligence claim, all that remains is the computation of damages.

1.    **Future Lost Wages: $363,225.00**

Wright seeks recovery of $363,225.00 for future lost wages from his employer ASI based on his testimony and that of his economic expert Dr. Carter.

"There is no dispute between the parties that lost wages (past and future) are a proper category of damages in cases under the Jones Act and for unseaworthiness under the general maritime law."  Baucom, 560 F.Supp.2d at 1201 (citing Vickers v. Tumey, 290 F.2d 426, 434 (5th Cir. 1961) ("in a seaman's action either under the Jones Act or maritime doctrine of unseaworthiness, a part of the recovery, if otherwise permissible, will be the loss of wages from the date of the injury down to the trial and, if established, the probable loss of wages in the

future")).   In Culver v. Slater Boat Co., 722 F.2d 114, 117 (5th Cir. 1983) the Fifth Circuit established a four-step process for determining future lost wages: 1) estimate the loss of work life or expected remaining work-life of the plaintiff; 2) calculate the lost income stream; 3) compute the total lost income stream; and 4) discount the total present value.   The Eleventh Circuit acknowledged this as applicable to federal non-diversity cases.   Ageloff v. Delta Airlines, Inc., 860 F.2d 379 (11th Cir. 1988).

Wright seeks future lost wages from ASI and contends that he is unable to perform work that would be compensated above minimum wage.   However, Wright failed to provide sufficient support for this contention.   Specifically, Wright did not present any vocational expert testimony to support his contention.   Rather, Wright submitted only his subjective evaluation of his abilities.   The Court does not find Wright's opinion to be persuasive or credible.   Thus, Dr. Carter's projections of future income loss are without any evidentiary support since they are wholly dependent on the unfounded assumption that Wright will only be capable of minimum wage jobs for the entirety of his work life.

As enunciated in Baucom, 560 F. Supp. 2d at 1205:

…"tort law requires an aggrieved plaintiff to prove its damages with a reasonable degree of certainty." *Guyana Tel. & Tel. Co. v. Melbourne Int'l Communications, Ltd.,* 329 F.3d 1241, 1248 (11th Cir.2003). "[D]amages may not be determined by mere speculation or guess." *Maiz v. Virani,* 253 F.3d 641, 664 (11th Cir.2001); *see generally Systrends, Inc. v. Group 8760, LLC,* 959 So.2d 1052, 1076 (Ala.2006) ("It is true that damages may be awarded only where they are reasonably certain. Damages may not be based upon speculation.") (citation omitted). Yet plaintiff would have this Court engage in just such speculation or guesswork to compute future lost earnings, where…future earning capacity is unknown and unknowable … The Court declines plaintiff's invitation to engage in a *de facto* coin-flipping, palm-reading, fortune-telling enterprise as to what plaintiff's functional capabilities will be following recuperation from surgery, where the evidence will not allow even reasonable inferences to be drawn as to whether and to what extent plaintiff will be able to work in the future.[] Plaintiff having failed to prove any future lost wages post-recuperation from surgery to a degree even approaching reasonable certainty, he will not receive an award for this category of damages….

A plaintiff cannot "pass the buck" to prove damages: "[a]t the end of the day, it is plaintiff's sole responsibility to prove up his damages with reasonable certainty." Id. at note 37.

In Sum, Wright has failed to establish that he is unable, as a result of the May 9, 2014 electrocution, to earn comparable deckhand wages.  See, e.g., Baucom, 560 F.Supp.2d at 1205; Pettis v. Bosarge Diving, Inc., 751 F.Supp.2d 1222, 1244 (S.D. Ala. 2010).  The Court cannot join Wright in sheer speculative assumption, to summarily conclude that he cannot earn similar wages in the future and is forever limited to only minimum wage employment (with or without restrictions/limitations).  The Court cannot guess at the extent of his work capabilities in the future or what capacity (e.g., deckhand versus minimum wage or light work), and then attach a dollar figure for recovery.  As expressed in Baucom v. Sisco Stevedoring, LLC, 2008 WL 2428930, *2 (S.D. Ala. Jun. 12, 2008): "[t]his Court could make a guess…[b]ut the central point is this:…[such] would be sheer speculation…untethered from any evidentiary foundation. Plaintiff has proffered no proof…from which the Court might be able to assign probabilities to…different possible outcomes, or otherwise to make factual findings as to their relative likelihood."  Because of the absence of evidence that Wright will, in fact, lose the income he claims, the request for future lost wages is **DENIED.**

### 2.    **Medical Expenses**

Wright seeks recover of **$16,738.09** for past medical expenses.  Neither ASI nor Weeks have established that Wright is not entitled to recovery of same or that such amount has already been paid.  However, Wright did not even discuss, much less address, such unpaid/past medical expenses at trial.  Wright did not even claim that such was an unpaid expense that ASI/Weeks had failed to pay.  As such, this nebulous request appears to have no merit and because Wright failed to provide any support for same at trial, such is **DENIED.**

Additionally, Wright seeks recovery for an **unknown sum** for future medical expenses. While Wright has not established a residual disability as a result of the May 9, 2014 electrocution, he has testified that he will be undergoing future medical treatment (an orthopedist appointment scheduled a week after trial) and this Court's review of Dr. Thead's deposition revealed a December 13, 2014 recommendation for further testing/evaluation. However, the quantity and duration of any such future treatment is unknown. This is because Wright failed to submit any other evidence or testimony as to what such expenses may entail. And despite having the opportunity to do so, Wright failed to even identify the amount of, submit any support for recovery for, or even provide any estimate of, future medical expenses. This Court cannot guess and randomly assign an amount. Such must be based on evidence submitted to the Court – for which here, there is none. Thus, due to Wright's failure to submit an amount of and/or support for future medical expenses, the request is **DENIED.**

### 3. Pain and Suffering: $200,000

A damage award for pain and suffering may include a sum for mental anguish and physical discomfort, and for the mental and physical effects of the injury on the plaintiff's ability to engage in activities that normally contribute to the enjoyment of life. Thomas J. Schoenbaum, ADMIRALTY AND MARITIME LAW §§ 5–15.3, 6–18.4 (4th ed. 2004). These damages are not subject to precise measurement. Id. Amounts depend on the trial court's observation of the plaintiff, its subjective determination of a reasonable amount needed to achieve full compensation, and the facts of the case. Hyde v. Chevron U.S.A., Inc., 697 F.2d 614, 632 (5th Cir. 1983). However, "[i]n the presence of uncontradicted evidence of pain and suffering, a plaintiff bringing a claim in admiralty is entitled to a general damages award." Baucom, 560 F.Supp.2d at 1205.

The Court finds that an award of general damages is appropriate here to compensate Wright for the pain and suffering he has incurred as a result of ASI's negligence and the unseaworthy condition of Weeks' vessel on May 9, 2014. "The question is how large that award should be." Baucom, 560 F.Supp.2d at 1205. As set forth in Baucom at 1206:

> "Awards of pain and suffering are fact-specific and depend to a great extent on the factfinder's observation of the plaintiff and its subjective determination of the amount needed to achieve full compensation." *Gautreaux v. Scurlock Marine, Inc.*, 84 F.3d 776, 783 (5th Cir.1996). Although the fixing of damages for pain and suffering is necessarily a highly subjective plaintiff-specific exercise, rendering comparisons to awards in other cases of limited value, the Court's research has disclosed numerous instances where a plaintiff was awarded substantially less in general damages for pain and suffering than Baucom seeks here, despite similar or even more serious physical injuries.FN38 The Court derives "rough guidance" from these past awards. *Williams v. Chevron U.S.A., Inc.*, 875 F.2d 501, 506 (5th Cir.1989)
>
> > FN38. *See generally Gautreaux*, 84 F.3d at 783 (affirming award of $300,000 for pain and suffering where plaintiff "has undergone three surgeries, had his eyeball scooped out, is forced to wear a prosthetic eye which must be removed for cleaning frequently, and must endure both functional and cosmetic disabilities for the rest of his life"); *Williams v. Chevron U.S.A., Inc.*, 875 F.2d 501 (5th Cir.1989) (where plaintiff suffered lower neck injury on offshore platform, such that he was in a partially disabled state, the maximum appropriate award for pain and suffering was $200,000); *Holmes v. J. Ray McDermott & Co.*, 734 F.2d 1110 (5th Cir.1984) (affirming award of approximately $180,000 for pain and suffering where plaintiff suffered from herniated lumbar disc, had 10 to 15% permanent disability rating, and suffered ongoing depression); *Falconer v. Penn Maritime, Inc.*, 421 F.Supp.2d 190 (D.Me.2006) (canvassing case law for pain and suffering awards ranging from nominal amounts to millions of dollars, and deeming jury's $100,000 pain and suffering award adequate where plaintiff fell into open hatch on tugboat and sustained basal skull fracture, spinal fracture, pulmonary problems, and the like, and is permanently paralyzed in his mid to lower body); *Sanford v. Kostmayer Const. Co.*, 891 F.Supp. 1201 (E.D.La.1995) (jury awarded $250,000 for past and future physical pain and suffering where plaintiff received an anatomical disability rating of 15 to 20% as a whole, following surgery).

After consideration of the evidence presented at trial and the compensatory purposes and objectives of a general damages award, the Court finds that Wright is due to be awarded damages for pain and suffering attributable to ASI's negligence and Weeks' unseaworthy vessel. In arriving at this finding, the Court relies on a number of trial observations.

Wright suffered a severe electrocution – a traumatic and dramatic event – on his first day of employment with ASI on Weeks' vessel.  Since the electrocution, he has suffered pain, headaches, insomnia, had to use a walker, and had an elevated CPK.  However, Wright has received no permanent or partial disability impairment rating due to his injuries.  Additionally, per Dr. Chalhub, Wright has no work limitations/restrictions and he has reached MMI.  Moreover, the Court finds credible that Wright continues to experience discomfort and pain sporadically (Wright's Trial Ex. 17-C), which is managed with pain relief medication.  Thus, Wright's daily life has been impacted by the electrocution, and continues to be so, *to at least some extent*.  The problem is that Wright failed to present evidence establishing the severity/level of the impact on his daily life and how that interferes with his ability to work (*i.e.*, no vocational rehab assessment, etc.).

Based on the foregoing, it is the determination of this Court that a reasonable award to compensate Wright for pain and suffering due to ASI's negligence and Weeks' unseaworthy vessel is **$100,000.**[14]

**D.    Comparative Negligence Defense**

ASI/Weeks contend that Wright was solely at fault and/or contributorily negligent for selecting and handling a clearly defective electrical cord in that common sense dictates he should not have chosen and used it as was an open and obvious danger: thus, the electrocution was

---

14 See, e.g., Baucom, 560 F.Supp.2d at 1207 (awarding ¼ of the amount requested); Pettis, 751 F.Supp.2d 1222 (awarding seaman $10,000 in pain and suffering damages related to a diving incident that resulted in his treatment in a hyperbaric chamber and decompression sickness, which plaintiff alleged resulted in continuous recurrence of dizziness, nausea, vertigo, memory problems, confusion and insomnia); Campbell v. Chet Morrison Contractors, LLC, 2012 WL 3028079 (W.D. La. Jul. 24, 2012) (awarding plaintiff $150,000 for pain and suffering based on him wincing while exhibit the range of motion of his injured finger, and primarily upon his testimony of having severe pain daily when moving his injured fever which prevents him from enjoying hobbies, and that his pain caused debilitating headaches affecting his home life); and Offenbacher v. Ahart, 2009 WL 523097, *5 (D. Or. Feb. 25, 2009) (where an open unlit hatch on a vessel was the source of the injury, awarding $75,000 for pain and suffering as plaintiff "testified he suffered excruciating pain at the time of his accident. Although his injury is somewhat less painful now,…it still prohibits him from participating in leisure activities such as bowling, bike riding, or running[]").

100% his fault.

Comparative negligence applies to both unseaworthiness and Jones Act negligence claims. Baucom, 560 F. Supp.2d at 1207 (citing Churchwell v. Bluegrass Marine, Inc., 444 F.3d 898, 908 (6th Cir. 2006)).  This Court may consider any negligence by Wright as "comparative negligence to mitigate the damages in proportion to the degree of negligence." Bobb v. Modern Products, Inc., 648 F.2d 1051, 1056 (5th Cir. 1981), *overruled on other grounds by* Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 335 (5th Cir. 1997).  See also Kuithe v. Gulf Caribe Maritime, Inc., 2010 WL 3419998, *4 (S.D. Ala. Aug. 26, 2010 (a plaintiff's negligence will "not bar his recovery, but will reduce his damage award[]").  Additionally, the comparative negligence defense exists if there is "evidence that the seaman chose to perform a task in a manner that placed him in danger despite the fact that there were alternative means available to him." Churchwell, 444 F.2d at 908.  This means that a plaintiff's damages are "reduced by the degree of fault that the [finder of fact – here the Court] assigns to plaintiff's behavior." Id.  This doctrine is applied "to encourage reasonable care by seamen while at the same time placing a high degree of responsibility on owners for the unseaworthiness and safety of their vessels and appliances." Baucom, 560 F.Supp.2d at 1207.  Moreover, "[t]he standard of care for a Jones Act seaman is to act as an ordinarily prudent seaman would act in like circumstances[,]" Id., including his experience, training and education, Kuithe, 2010 WL 3419998, *5.  "[T]he seaman must in some circumstances exercise reasonable care to prudently choose the right equipment for the work to be done, if that equipment is available[]"…comparative negligence is an available defense if the plaintiff 'makes use of a defective appliance knowing that a safe one is available.'" Kuithe, 2010 WL 3419998, *5.  Notwithstanding a seaman's duty to use reasonable care, "a seaman has no duty to find the safest way to perform his work." Id.  Further, where a seaman

has the possibility of securing relief from an unsafe condition by informing his superiors of them, but continues to work instead, he may be found contributorily negligent.  See, e.g., Martinez v. Offshore Spec. Fab., Inc., 2011 WL 1527096, *7-8 (E.D. La. Apr. 20, 2011) (finding seaman 20% at fault for his injury when he had a possibility of securing relief from the unsafe condition but did not).[15]  However, such presumes a seaman was aware of the unsafe condition.

In light of the evidence at trial and circumstances surrounding the May 9, 2014 accident, the Court finds Wright **20% at fault** for his injury.

Weeks/ASI contend that because the cord was obviously defective and Wright was an experienced deckhand that Wright should be barred from any recovery as being completely at fault.  The Court disagrees.

Specifically, Wright had been on the boat approximately 12 hours when he was directed by the captain to find and use an extension cord.   While he had been shown around the vessel briefly, Wright certainly had not had time to inspect the equipment on the boat.  Thus, when attempting to rapidly respond to the captain's order, Wright grabbed the first extension cord he saw and used it without inspection.  While in hindsight the cord is visibly defective, at four o'clock on a rainy morning, it may not have been as obvious.  This is borne out by the fact that the captain also handled (or at least saw the cord) while Wright was using it, but did not take any action.  Moreover, it was not unreasonable for Wright to rely on Weeks' duty to provide equipment fit for its intended use and ASI's duty to provide a safe workplace.  Thus, while the Court agrees that Wright should have taken the time to inspect the visibly defective cord,

---

15 "The Plaintiff was contributorily negligent. In light of his extensive experience working aboard boats and as a mechanic, the Plaintiff knew or should have known that using a sledgehammer in cramped conditions such as those aboard the M/V MR. GILBERT could increase the risk of injury. The Plaintiff also knew or should have known that Offshore had a "work-stop" program through which the Plaintiff could have immediately stopped work on the frozen winch pin until a safer method could be determined." Id.

Weeks/ASI's culpability is substantially greater.

The Court finds Wright was **20% negligent**.  As such, the $100,000 award is **reduced 20%** so that Wright is awarded the total sum of **$80,000.**[16]

## III.   Conclusion

Upon consideration, it is **ORDERED** that:

1) ASI/Weeks' request for entry of a **DECLARATORY JUDGMENT** concerning the commencement of payment of maintenance and cure to Wright is **MOOT,** but ASI/Weeks' request for entry of a **DECLARATORY JUDGMENT** concerning *future* maintenance and cure to Wright is **GRANTED** insofar as ASI/Weeks' maintenance and cure obligations have been fulfilled as Wright has reached MMI;

2) **JUDGMENT** is entered in favor of Wright and against ASI as to Wright's Jones Act negligence claim;

3) **JUDGMENT** is entered in favor of Wright and against Weeks as to Wright's unseaworthiness claim;

4) Wright's past and future medical expense damages claims are **DENIED;**

5) Wright's past lost wage damage claim is **DENIED;**

6) Wright's future lost wage damage claim is **DENIED;**

7) Wright's pain and suffering damages are **GRANTED** insofar as such damages are awarded in favor of Wright and against Weeks and ASI, in the amount of **$80,000;**

---

16 See, e.g., Kuithe, 2010 WL 3419998, *5-6 (finding seaman's negligence – the manner in which he chose to descend a ladder -- contributed 20% to his injury); Scott v. Fluor Ocean Servs., Inc., 501 F.2d 983, 984 (5th Cir. 1974) (upholding a reduced damages award for plaintiff in a Jones Act negligence suit when jury found him 75 percent responsible for his injuries); Huss v. King Co., Inc., 338 F.3d 647, 651 (6th Cir. 2003) (reduction of damages to seaman by 60% for his comparative fault was not clearly erroneous: "[t]he court's determination was based on extensive findings, including that Huss and his coworkers had a duty to ensure the operation was performed safely, that Huss crawled under the boat without having been instructed to do so and later admitted that it was stupid, and that he remained under the boat when his supervisor crawled out from underneath the boat[]"); Offenbacher, 2009 WL 523097, *5 (where an open unlit hatch on a vessel was the source of the injury, awarding $75,000 for pain and suffering reduced by 30% for his comparative negligence for a total award of $50,000); Gomez v. Sanches Vda de Gonzales v. Naviero Neptuno S.A., 641 F. Supp. 75, 79 (E.D. Tex. 1986) ("[t]he Court concludes that the deceased…contributed to his death in failing to keep a proper lookout for his own safety, and such contributory negligence or fault is attributable in whole or in part to the death of the deceased, and…that such contributory negligence is in the amount of twenty-five (25%) percent, and thus the amount of damages awarded to the Plaintiff is reduced by twenty-five (25%) percent[]").

8) Wright's maintenance and cure attorneys' fees and punitive damages claims are **DENIED**; and

9) A Final Judgment shall issue in conjunction with this Order.

**DONE** and **ORDERED** this the **15**th day of **July 2015.**

/s/ Kristi K. DuBose
**KRISTI K. DuBOSE**
**UNITED STATES DISTRICT JUDGE**